Pironi *v.* Corrigan.

MARY PIRONI

*v.*

PATRICK CORRIGAN.

1. If a conveyance of land be made for a consideration in services afterwards to be performed by the grantee, and the grantee fails to perform, the conveyance will be set aside at the instance of the grantor.

2. When confidential relations exist between two persons resulting in one having influence over the other, and a business transaction takes place between them, resulting in a benefit to the person holding the position of influence, the law presumes everything against the transaction, and casts upon the person benefited the burden of proving that the confidential relations had been, as to the transaction in question, suspended, and that it was fairly conducted as if between strangers.

On final hearing on bill, answer and proofs.

*Mr. William M. Johnson,* for the complainant.

*Mr. William E. Skinner,* for the defendant.

PITNEY, V. C.

The bill is filed to set aside a deed of conveyance of land made by the complainant to the defendant, upon the ground of failure of consideration of the same. The deed is dated June 24th, 1889, and the consideration named in it is $1,000. Complainant contends that no money whatever was paid to her by the defendant, and that no money consideration was agreed upon between them, but that the real consideration was an undertaking on the part of the defendant to perform a certain service for her which he entirely failed to perform.

The allegations of the bill are, that complainant is upwards of seventy-six years of age, of Irish birth, and was first the wife and then the widow of one Mehan; that about fifteen years ago she married an Italian named Pironi, many years her junior; that she owned in her own right a lot of land with several tene-

Pironi *v.* Corrigan.

ments on it at Fort Lee, Bergen county; that her husband of late years had become very abusive of her, and had threatened her, so that she was afraid of her life at his hands, and had become very desirous of some kind of separation from him, and for that purpose applied to the defendant, a Catholic priest, to bring about such separation and free her from the presence of her husband; that defendant undertook to effect such separation in consideration of her conveying to him her said real estate in fee, retaining to herself a life estate in it; that the deed in question was prepared by or under the direction of the defendant and executed by her, "upon his solemn promise that he would procure a final separation between your oratrix and her said husband, so that she would be forever free from his interference and molestation."

It further alleges, that, at the time of the execution of the deed, defendant produced a roll of bank-bills, which he offered or handed to her, and, without any explanation, took them back into his own possession, and never did pay her any consideration in money for said deed. It further alleges, that defendant did not carry out his agreement to procure said separation, and did not make any attempt to do so, and that said Pironi has ever since remained in her house, continuing to ill-treat her and to disturb her peace, and that she is living in great fear of him.

The defendant, by his answer, denies that he made any promise, or in any wise undertook to procure any separation between the complainant and her husband as a consideration for the conveyance, or otherwise; and he denies that there was any such consideration expressed or implied. He alleges that the true and only consideration for the deed was the sum of $1,000, actually paid by him to her, and by her retained, and an estate for life in the premises granted by him to complainant by deed of even date, and that such consideration is a fair one for the premises.

From this brief statement of the pleadings it appears that the issue between the parties is two-fold.

*First.* Did the defendant undertake, as a consideration, in whole or in part, of the conveyance, to procure the husband of

·the complainant to leave her house and separate·himself from her?

*Second.* Did he actually pay her the sum of $1,000, the con-·sideration expressed in the deed?

On both branches of the issue the parties are directly opposed to each other in their testimony. As to the first branch, it is at ·once apparent that the peculiar nature of the alleged contract might well lead to an honest misunderstanding between them. But as to the second branch—the matter of the payment of the ·$1,000—there is, as it seems to me, no room for mistake or mis-·understanding, and it is quite impossible to reconcile their testi-·mony, so that the unpleasant duty is to be performed of deciding ·which party probably tells the truth in that behalf. This renders ·it necessary to make a careful examination and somewhat extended ·statement of the evidence.

The complainant, professing ignorance of her exact age, says she is at least seventy-six years old, and other testimony in the ·case, in connection with her appearance, renders it probable that ·she is over eighty. She is Irish born, but is an old resident of Fort Lee. Her first husband, Mehan (by whose name she is still generally known), died there in 1873, and within a year thereafter she married Auguste Pironi, an Italian, then thirty years old and at least that number of years her junior. Her ·first husband devised to her the premises here in dispute, consist-ing of upwards of two acres of land, upon which were situate three or four tenements, and worth at this time from $3,000 to $4,000. In one of the houses she and her husband have lived ever since the marriage, and out of the rents of the other tene-ments she had accumulated some ready cash, how much does not appear, except that one person paid her $850 in November, 1888. It also appears that she kept money hidden in various places ·about the house. She is entirely illiterate, but naturally bright and witty and somewhat eccentric; very penurious, close and ·exacting in money matters, but prompt and ready to pay her debts, and honest in her dealings. Her honesty and general uprightness are testified to by the defendant himself. Not a ·breath against her character for truth and veracity was heard in

the case.   She has no children or descendants, her only relations.
being a brother and his children, for whom she seems to have
had very little affection.   For several years prior to the transac-
tion here in question she had entertained strong feelings of dis-
like for and dread of her husband, and had charged him with
cruel treatment and with having threatened her life.   She talked.
of her difficulties with him and fears of him to all her friends.
Whether there was any real foundation for her feelings and fears
in that respect may be doubted, as her husband seems to be a,
decent, sober and industrious laborer, but that her feelings in'
that respect were real and not affected, and that she really feared.
her husband, and was most anxious to be relieved of his presence,.
was thoroughly established by the evidence and not disputed by
the defence.   Mr. Christie, who had known her for many years.
and had acted as her counsel, said that it had become a mania.
with her, and that she was continually urging and beseeching
him to get her a divorce.   Apparently the one great absorbing·
desire of her existence was to be rid of her husband.   On June·
3d, 1889, she called upon a society of nuns, who had an estab-
lishment near by, and talked with one of them about the cruelty·
of her husband and her desire to be rid of him.   Complainant
swears that the nun whom she saw mentioned the defendant as a.
good priest and likely to help her, and proposed to send for him,
to which she consented.   The nun herself swears that complain-
ant talked about her troubles with her husband, and inquired for·
defendant, and asked her to write to him to come and see her.
On the next day the nun did write to defendant a letter, as
follows :

" INSTITUTE OF THE HOLY ANGELS, FORT LEE, }<br>
" June 4, 189'.   }

*"Rev. and Dear Father :—*

   " Pardon me for troubling you with a few lines.   It is at the *urgent request'*
of one of your old parishioners, who says she must see you as soon as possible,
as you are the only one in the world she has any confidence in.   It is, I think,
better that I do not mention her name, owing to some points which I will
explain when I see you.   She is a perfect stranger to me, as I never spoke to·
her till yesterday, when she called and begged me to write to you and request.
you to come *at once* to her.   She lives very near the convent, and if you call
here I will tell you the substance of her conversation.   One thing, *you* are the:

Pironi v. Corrigan.

*only one* she has any faith or confidence in.  Poor old creature, she is very un-
happy.  Please drop me a line if you can't come.  Begging your blessing and
prayers, I am, dear father, Yours sincerely,

"SISTER M. NONA."

The secular name of this nun is Sarah Dunphy.  The next
day, June 5th, defendant came to Fort Lee, and, after seeing the
nun, called on the complainant.

He is a well-known Catholic priest, who has been for many
years over a parish in Hoboken, nine miles from Fort Lee.  From
1863 to 1866 he was in charge of the parish in which complain-
ant lived, and knew her as one of his parishioners.  Since 1866
he has not lived nearer to her than Hoboken, and has seen her
seldom, if at all, and certainly not within twenty years.

Complainant says that at this interview she told defendant of
her troubles with her husband, and her desire to be finally rid
of his presence, and offered to give him a portion of her prop-
erty if he would bring it about; and that defendant promised to
do so, and to that end procured Mr. Christie (a practicing lawyer
living near Fort Lee and having an office at Jersey City) to
write her will giving him the property, and that she executed it
in reliance upon the defendant's promise to bring about the
departure of her husband.  Defendant, in his testimony, does
not state what he learned from the nun as to the nature of com-
plainant's great trouble, but admits that complainant talked to
him at this first interview about her husband's cruel treatment
of her and her desire to be separated from him, but he denies
that then, or at any other subsequent time, he promised to
procure a separation, but declares that he at all times confined
himself to an expression of willingness to exert his influence with
Pironi to treat his wife with kindness.  The result of the first
interview was, that the defendant, after consultation with Judge
Garrick, of Jersey City, who was his friend of many years'
standing, and whom he was in the habit of consulting upon
legal matters, called on Mr. Christie on June 6th, and requested
him to visit the complainant, stating to him the nature of the
business to be transacted.  Mr. Christie called upon the com-
plainant at her house, June 7th, and there, in defendant's absence,

and by complainant's instruction, prepared for her a will giving all her property to the defendant, without condition or limitation. She executed it with the statutory formalities, and kept possession of the document. There can be no doubt that this was her free and voluntary act and deed, but whether she intended to die testate of it or not is, to my mind, doubtful. At the same time she destroyed a previous will prepared by Mr. Christie, by which she had given all her property to the poor of Ridgefield township, in which Fort Lee is situated. This later will was, in its turn, shortly afterwards destroyed by the complainant, but precisely why and under what circumstances and influences does not clearly appear. Complainant gives no reason directly for its destruction, but the defendant says she told him that she had heard it read by one of the nuns, and that it did not contain what she wished, and so she destroyed it, and he says she gave the same reason to the nun. The nun was not called upon to prove in what respect complainant found the document defective. One remark uttered by complainant in the course of her evidence is worthy of notice, though not connected with the will. She said that "she was not going to give away her property for nothing." Within ten days from its date, that is, on or before June 17th, the plan of making a deed in place of a will was proposed, but by whom does not appear. All that is certain is, that the parties had an interview, and the making of a deed was mentioned and agreed upon. Complainant, on the one hand, swears that defendant agreed, as a consideration for it, to procure a separation from her husband, and defendant, on the other hand, denies it, and says that it was a free gift on her part, without any valuable consideration whatever. This, I stop to remark, is not in accord with the statement of the answer, which puts the affair in the shape of an ordinary contract of purchase and sale for the consideration of $1,000, which is there alleged to be the full and fair value of the premises. The result of the interview was, that on the 17th of June defendant, after further consultation with Judge Garrick, called on Mr. Christie and requested him to prepare a deed in fee from the complainant to the defendant of all her property, and a deed from the defendant to the complainant

of the same for life. This Mr. Christie did, and handed them
to Judge Garrick, who had his office in the same building with
him. Defendant says that the complainant objected from the
start to the intervention of Mr. Christie, for the reason that he
lived near Fort Lee, and would be likely to tell people what she
was doing, and the fact would in that way come to her husband's
ear, and he would kill her, and for that reason requested defend-
ant to procure some good Catholic lawyer who did not live in
the neighborhood. The defendant insisted on Mr. Christie
attending to the matter of the will, because he was her stated
counsel, but consented that Judge Garrick, who was a Catholic,
should attend to the execution of the deed, and employed Mr.
Christie to prepare it only because he was familiar with the prem-
ises. The defendant consulted with Judge Garrick freely in the
affair, and in fact before the will was prepared, and learned from
him that a conveyance would not be available unless the husband
joined in the execution, and defendant at once sounded Pironi
on the subject, and learned that he would so join upon being paid
$100, which he declared complainant had stolen from him. De-
fendant agreed to pay him this $100 upon the execution of the
deed, and also $12 a month during complainant's lifetime.
Defendant disavowed any belief that complainant had actually
taken the money from her husband, but said he was willing to
pay the $100 in order to satisfy Pironi, and he says that the $12
a month was to be paid to Pironi as an inducement to him to be
kind to complainant, and was to be paid only upon defendant's
being satisfied that he had been kind to her, and that it was not
to be paid to induce him to leave and separate himself from his
wife, and that such separation was not part of the bargain. In
this negotiation with Pironi, who spoke English imperfectly,
defendant employed one Cereghino, an Italian insurance broker
and interpreter, living at Hoboken, who made as many as five
visits, in the course of this business, to Fort Lee. This witness,
who was called by the defendant, testified to a very important
circumstance in connection with his first visit to Fort Lee, viz.,
that he on that occasion, by defendant's instruction, sounded
Pironi as to his being willing to live separate from the complain-

ant, and talked with him about the fact that he owned a house of his own in Fort Lee, and suggested that with the aid of a monthly payment by the defendant he could live there more cheaply and more satisfactorily than with his wife. In fact, he testified outright that defendant instructed him to bargain with Pironi to leave his wife and live away from her. Cereghino's negotiation resulted in bringing Pironi to Jersey City to Judge Garrick's office on the 24th of June, the day of the date of the deed. There he met the defendant, Judge Garrick and Mr. Christie, as well as Cereghino. The deed was produced, as prepared by Mr. Christie; the date and consideration (to be further noticed hereafter) were inserted by Judge Garrick upon the defendant's instruction, and Pironi was induced to sign it upon the promise of the payment of $100 when it should be signed by his wife, and of the further payment of $12 per month during her lifetime. Much time was spent in direct and cross-examination of the five participants in the conversations and transactions of June 24th as to their particulars and details. A careful examination and comparison of the different accounts develops little or no variance in them. Defendant promised Pironi $100 cash down upon his wife's execution of the deed, and $12 a month during complainant's lifetime, if he would sign the deed and go away and leave complainant and not further disturb her. Defendant insists that the $12 a month was to be paid Pironi to induce him to be kind to her, but he admits that Pironi then and there declared that he wished to leave his wife, and did not wish to live with her any more, and I interpret the evidence of the other witnesses to mean that they understood that Pironi actually agreed to leave his wife. Pironi demanded something in writing to show for his money, and he swears that he stipulated for this in his preliminary negotiation with Cereghino. The defendant declined to give a written stipulation, but called upon Judge Garrick, Mr. Christie and Cereghino to witness his promise to pay him. Pironi accepted this temporarily, but insists upon it that he understood that after his wife had signed and he had been paid his $100, he was to have a writing to secure his $12 a month. Judge Garrick had no acquaintance with complainant,

Pironi v. Corrigan.

and no knowledge of her troubles with her husband, and did not understand that the consideration for the deed was the proposed separation of husband and wife, but understood from defendant that the conveyance was a pure gift to the defendant. But Mr. Christie, who was familiar with the circumstances, swears that his understanding was, that the only consideration for the conveyance was the separation, and that the $12 a month was to be paid to secure that end.

I quote from Mr. Christie's evidence as follows:

"*Q.* Was anything said at the conversation, when he [defendant] requested you to draw the deeds, about her husband, or a separation being procured?

"*A.* At that interview, or at some interview about that time, he did say to me that her husband was to leave her, and he [defendant] was to see him about leaving her, or procure his leaving her in some way; that is my remembrance.

"*Q.* What was the consideration to be for that conveyance to him, as you understand it?

"*A.* I did not understand any other consideration than the consideration of a charitable consideration.

"*Q.* The same as the will?

"*A.* The same as the will; that is my understanding of it.

"*Q.* Was not this separation of Pironi—was not that part of the consideration?

"*A.* As to the separation from Pironi, I understand that that was the agreement with Mrs. Mehan [complainant], that Pironi should leave the complainant and live elsewhere, as a part of the whole transaction."

Coming now to June 25th, the date of the execution of the deed by complainant, the defendant, Judge Garrick and Cereghino met, by appointment, at complainant's house at Fort Lee. Pironi was sent for from his work and brought in, and the deed produced and explained to complainant by Judge Garrick. It was then stated that Pironi was to leave complainant and stay away. Judge Garrick swears that complainant talked over her troubles with her husband, and stated distinctly her desire and expectation that her husband would leave her, and that the defendant said he was to leave, and that Pironi also said that he was to leave and not come back, and that complainant fully expected he was going to remain away from her. After the deeds were signed and delivered and Pironi had received his

$100, which, by the way, was paid to him privately, and its pay-
ment concealed from the complainant, the defendant suggested
that it was unsafe for the complainant to live alone in the house,
and that a female companion should be procured for her, and he
said that he knew one in Hoboken who could be induced to come
and live with her, and he instructed Cereghino to attend to the
matter, and further suggested that in the meantime Pironi should
stay with the complainant until the companion arrived, which
would be in a couple of days. Complainant and Pironi con-
sented to this—the complainant reluctantly—and the parties left.
Defendant returned home and went, as he says, immediately into
the annual retreat which the rules of the church impose upon
the priests, and paid no further attention to the affair until about
two months afterwards, when he received a letter from a lawyer
named Andrews, living in Fort Lee, written in complainant's
behalf, stating that she was dissatisfied, and that she had not
been paid the sum of $1,000, and demanding the return of the
title. He then, instead of going himself, sent Cereghino up to
Fort Lee to ascertain what was the difficulty. Now, this send-
ing of Cereghino, I think, is significant, and shows that the
defendant suspected that the difficulty arose from Pironi's
conduct.

From this review of the evidence, I think it is thoroughly
established that defendant did agree with Pironi to pay him $100
cash and a further monthly payment of $12 in consideration of
his signing the deed, and as a compensation for his actually
absenting himself from complainant's house and presence and
not molesting and disturbing her, and that the payment was so
arranged in installments to secure the performance of the agree-
ment on Pironi's part. It is admitted that defendant entirely
failed to procure a female companion for complainant, making
very little effort in that direction, did not pay Pironi his
monthly dues, and so the arrangement fell through, and Pironi
has continued to live with complainant in her house and entirely
against her will. I am further satisfied, taking the whole evi-
dence, as well the complainant's as the defendant's, that the com-
plainant supposed that the bargain was, that the defendant would

procure the desired separation, and that he promised her to do so early in the affair. I think the sending of Cereghino to Fort Lee to see Pironi, so early in the affair and so long before the deed was executed, with authority to promise the $100 cash and the monthly payment of $12, in the language of Cereghino, if he would "leave the old lady alone," "to leave her in peace," "to live by herself," is very significant. I do not find in the case any sufficient motive for defendant doing that, unless he felt himself under some kind of obligation to bring about that result. Then we have the evidence of Mr. Christie, above quoted, to the effect that defendant told him he was to see to Pironi's leaving. Then the strong desire of the complainant to be rid of her husband must not be lost sight of. It was her ruling passion, and it is plain enough, from the nun's letter, that it was the real cause and motive of her sending for defendant, and I do not believe she would have made the conveyance except upon the promise and understanding that the desired result was to be brought about. It may be that the defendant did not, in so many words, covenant and agree to do this very thing, and it may be that it was not said, in so many words, that the procuring the separation was the consideration for the conveyance, and it may be that defendant could not be compelled by law or in equity to do it, or to pay damages for not doing it. But that is immaterial. The question is, did not complainant make the conveyance in the honest belief that the defendant had agreed to do it, and in the confidence that he would do it, and did he not know and understand the state of her mind on that subject? I cannot but believe the affirmative of both propositions. I cannot doubt that at every interview between the parties the complainant rehearsed to defendant her miseries and fears, and begged him to relieve her, and that throughout the transaction she was, at all times, acting on the supposition that she was to attain that end. The just expectation of the complainant has not been fulfilled, and that part of the consideration of the deed has failed. This conclusion leads to the setting aside of the conveyance (*Crimmins* v. *Crimmins, 13 N. J. L. J. 12; Armstrong* v. *Ebener, 1 Dick. Ch. 457*), the only question being, what terms, if any, should be

imposed.   If the sum of $1,000 was actually paid and retained by complainant, then, of course, defendant is entitled to be repaid that sum.

Turning now to the question of the payment of the $1,000. Complainant swears, in the most positive manner, many times over, that the defendant did not pay her any money; that he put one or two dollars in her hand and took it right away again. On the other hand, the defendant swears that he procured from the bank $700, in $100 bills, which, added to $400 which he had on hand of smaller bills, made $1,100; that he took this money with him to Fort Lee and handed complainant $1,000 of it in Judge Garrick's presence; that she put it in the bosom of her dress and immediately left the room, going to an adjoining room, as if to hide it, all in Judge Garrick's presence, and that he never received any part of it back again.

I wish I could believe that complainant might be mistaken, and might have received this money and laid it away and forgotten it, but I cannot.   With this direct, positive and irreconcilable conflict in the testimony, it is, of course, important to look at all the surroundings for confirmation or contradiction of the stories of the one and of the other.   Defendant says (varying in that respect from the allegations of the answer) that the conveyance, when first agreed upon, was to be a pure gift, without any moneyed consideration whatever.   He so, at all times, stated to Judge Garrick and Mr. Christie, and when asked on the stand why any moneyed consideration was mentioned and paid, he made this statement—which I paraphrase from his direct and cross-examination—that on a visit which he made to complainant, after he had ordered the deeds to be prepared and before their execution—that is, between the 17th and 24th of June—she complained of the character of the tenants in one of her houses; said that they were low Italians, and she would like to be rid of them.   The defendant asked why she didn't turn them out, and she replied that the house was so poor that she could not get a better class of tenants in it, and she said she wished he would build a new house for her.   The defendant asked how much it would cost.   She replied $800.   The defendant then

Pironi *v.* Corrigan.

said, "I will give you $1,000 and you can build the house your-self, or do what you wish with it."

In this connection, it is to be noted that at first he said, on cross-examination, and repeated it, that he had no recollection of seeing the complainant between the time he ordered the deeds to be prepared and the occasion of their execution. But when his attention was called to this statement, made on his direct exam-ination, about the proposed new tenement, said he must have made an intermediate visit. Now, the complainant denies, in the most positive manner, that she had any such talk with the defendant about a new tenement, and I can find no support for it in the case outside of the defendant's evidence. There is not a particle of evidence that complainant ever complained of her tenants to anybody, or expressed any desire for a new tenement. Her denial was made in answer to questions put to her on cross-examination, and before, as far as I can see, it had at all appeared in the case that defendant intended to set up and rely upon the statement in that behalf, which he afterward swore to; and I do not see how complainant could have foreseen the direction and importance of the questions put to her in that behalf, or have anticipated being examined upon the subject, and for these reasons I think her denial has great weight. And, further, I feel constrained to say that this part of defendant's statement seems to me, under the circumstances and upon its face, a little lacking in probability. He swears that he considered the prop-erty worth much more than $1,000, and that he could well afford to *give* complainant that sum in view of the value of the gift she was making him, and that he did it in that spirit.

The next circumstance to be noted is the fact, that at no time previous to the execution of the deed by the complainant did the defendant mention to any person that he was to pay any money consideration for the conveyance, but spoke of it to both Mr. Christie and Judge Garrick as a pure gift. On the 24th of June, at Jersey City, when the deed was signed by Pironi, defendant directed Judge Garrick to insert the date and the con-sideration of $1,000, without the least whisper of explanation of the latter, so that Judge Garrick was entirely surprised the

next day, at Fort Lee, to see the defendant hand the complainant a roll of bills after the execution of the deed, and supposed it was a mere matter of form, and that the money would be returned; and Pironi swears that he never, at any time, heard that any money was to be paid, or was, in fact, paid to complainant. The evidence of Judge Garrick is very important, and was given in such a careful, frank manner as to give it great weight. The same must be said of Mr. Christie's evidence on the other part of the case. Judge Garrick says, that after the deed had been signed by complainant, and acknowledged by her and her husband, and all except the complainant, defendant and himself had left the room, the defendant produced a roll of bills, which, from its appearance, witness thought might contain $1,000, if composed of $100 bills, and counted the bills over his fingers and handed the roll to the complainant and said: "There is $1,000." That he saw complainant take it in her hands, heard her laugh and make a jocose remark (which defendant says was this, "Is not this very kind of him?"), but did not see her put it in her dress or leave the room. He himself left the room within a minute, and left complainant and defendant together there. Defendant swears that Judge Garrick left the room *after* the complainant had put the money in her bosom and had gone out with it into the adjoining room. Judge Garrick says he was not near enough to see the denomination of the bills and was not called upon by anybody to count the money or witness the payment. This witness says that there was nothing in what was done by either party in his presence to indicate whether the money was, or was not, handed back to the defendant. He says, simply, that the previous statement of the defendant that the conveyance was a pure gift, his failure to give any reason for writing "one thousand dollars" as the consideration, or at any time to hint that any money was to be paid, and the laugh and jocose remark of the complainant when it was handed her, and the manner of defendant in handing it, led him to suppose that the handing the money to the complainant was a mere form, and that it would be returned. I deem it proper to remark here, that I think the impression made upon Judge Garrick by what

Pironi *v.* Corrigan.

he knew and saw is entitled to great weight, and further, that if this had been a real payment, it seems to me that something more of care and detail would have attended it.   Judge Garrick would have been asked to count the money and to witness its payment, and some explanation of the reason for the payment would have been given.

The next circumstance to be noted is the first interview between the parties after the occasion of the execution of the deed.   The defendant, after receiving the letter from the lawyer, Andrews, by which he learned that the complainant was dissatisfied and denied that he had paid her $1,000 and wanted her property back, and after sending Cereghino to ascertain the situation of affairs at Fort Lee, went himself and called upon the complainant.   He found her at home with a neighbor, a Mrs. Cattello, who testified as to what took place.   Mrs. Cattello's daughter, a Mrs. Stewart, lived in one of complainant's houses.   She was in the habit of visiting her daughter, and also the complainant. She apparently knew that complainant was dissatisfied with the defendant's conduct, and that she complained that he had falsely pretended to have paid her $1,000, and had failed in his promise to rid her of her husband's presence.   While this witness was near complainant's door, she saw defendant approaching and informed complainant of the fact, and was by her asked to come in and be present at the interview.   She swears that, as soon as defendant came into complainant's house, the complainant, in the language of the witness, "flew at him," and asked him if he had not said that he had paid her $1,000 for her place.   The defendant replied, " No, it is a lie, Mary ; I have not given you $1,000, nor one cent, never, and I don't want your place or your money."   Complainant then asked him, " Didn't you promise to put Auguste away?" to which defendant did not reply, but turned to the witness and asked if she were a Catholic, and she replied, "A kind of a one."   That he then said, " You are here for a spotter."   She further says, Mrs. Pironi told Father Corrigan that he promised to put Auguste away, and that he gave him (Pironi) $100 for to do it, and he (Father Corrigan) said it was a lie.   She said, " Hold on, and I will send for Auguste."   She said

Auguste had told her, and he (Father Corrigan) said, "I do not want to see the Italian rascal." The witness then, in answer to a question put by the court, repeated her previous statement, that the defendant said that he had never given complainant any $1,000, and that he further said that the folks around there only wanted to torment her (complainant), that he had not come to see her on business, but to instruct her in her Easter duties. To this complainant replied that it was not Easter then, and then flew at him again about the $1,000, and they parted bad friends. This witness was not in the least shaken on cross-examination. She is a middle-aged Irish woman, of decent appearance, against whom nothing appears, except that she is a friend of the complainant and became offended at the defendant on account of his speaking of her as a "spotter." It is possible that, in the clatter of the talk, she misunderstood what was said, but I am unwilling to believe that she invented any part of her story.

This interview took place early in September. A few days later defendant called on complainant a second time and found her at her door, and a witness, one Stewart, who lived in complainant's house next door, was sitting with his child near her door and heard what passed. As soon as defendant approached complainant she attacked him about the $1,000, and asked him to say there, in the presence of the witness, whether he had given her $1,000 for her property. Her manner was very bold and defiant, and she repeated the question several times and told the defendant to say "yes or no" in the presence of the witness. At first the defendant made no direct answer, but said that people were vexing her, and she persisted in her questions and he tried to turn the conversation by saying that he had not come for that purpose, but to bring her nephew's address; but she persisted in demanding an answer to her question, and, finally, the defendant replied that he did pay her $1,000, and that she rolled it up and carried it into the room. Complainant at once denied this, and said that the defendant was a liar, and that she never got the money. She also said that he had promised to put Auguste away and had not done it, to which defendant made no reply.

This witness also was not shaken on cross-examination, and the truth of his statement is substantially admitted by defendant.

The noticeable feature of these interviews is, that this poor, ignorant, illiterate old woman, bred a Catholic, and apparently without any practice in the art of dissimulation or acting a part, would dare, at her time of life, to charge a priest of her faith to his face with falsehood and false dealing, and to deny with vehemence his statement as to the matter in dispute. That she was most bold, courageous and defiant throughout both interviews, appears not only from the evidence of the two witnesses, but from the account of the interview given by the defendant himself. I find it difficult to believe that she could have assumed and maintained such an attitude toward defendant if she had not felt that she had truth on her side. It seems to me that such courage could have been born of nothing else than conscious rectitude.

Of course, if Mrs. Cattello's evidence is reliable, it argues strongly in support of complainant's story. The defendant, however, denied Mrs. Cattello's statement, and declared, upon the first day of his examination, as I understood him, that the matter of the payment of the $1,000 was not mentioned in her presence, or at all, at the interview witnessed by her. He says that he requested a private interview, and asked Mrs. Cattello to remain outside, and that she became angry and abused him. At a continuation of his examination on a later day, he said that, either in Mrs. Cattello's presence or that of Stewart, complainant did charge him with not having paid the money, and that he declared that he did pay it, and that the complainant called him a liar. In fact, he substantially corroborated Stewart's account of the second interview. It appears from his testimony on cross-examination, that he had but these two interviews after the execution of the deeds, and he said, in a complaining tone, that he was unable to get a private interview, and his explanation of her change of feeling toward him, and her denial of the receipt of the $1,000, was, that she was put up to it by some people in the neighborhood, of which, however, no proof was offered. The theory of the complainant is, that at the interview

testified to by Mrs. Cattello, defendant admitted the truth, and expected to pacify complainant at a private interview; that he visited her a second time in hope of finding her alone, and having learned in the meantime that Judge Garrick had not seen the money handed back, determined, if again challenged on the subject, to assume the position he has since maintained. It is worthy of note in this connection, that after complainant's dissatisfaction had manifested itself, Mr. Christie called on her (August 13th, 1889), at her request, and found her in a state of excitement, and that she wished him to undertake to get her property back. He declined the job, and explained to her the effect of what she had done, and tried to satisfy her with the suggestion that it was the same, in effect, as the will she had made, but without success.

There are two matters, in which it is alleged on the part of the defendant that the complainant is contradicted and shown to be unreliable in her evidence, which I will notice. The first one is this: She swore that a short time after she had executed the will in defendant's favor, the defendant came to her house with a judge and a lawyer (by "lawyer," I think it is plain she meant Cereghino, the interpreter), and that on that occasion she burned the will in her stove and showed them the ashes, and on the same occasion executed the deed. The defendant, on the other hand, swore that she told him, at the first interview he had with her after the execution of the will, that she had lodged it with the nuns for safe-keeping, and had heard them read it, was dissatisfied with its contents and had already destroyed it. Judge Garrick swears that there was no destruction of the will in his presence, or any ashes shown. Complainant's account of the several interviews she had with the defendant prior to the execution of the deed, is quite confused. Her command of language and ability to narrate is limited. Cereghino says he went to Fort Lee three times before the execution of the deed, and on one of those visits defendant was with him, and they saw the complainant together, and on another of them he saw the complainant alone. On a careful examination of the complainant's evidence, I am not satisfied that she intended to swear that she

burned the will in anybody's presence, and it may be that the fact of its being burned was mentioned to the defendant in Cereghino's presence, whom she supposed to be a lawyer, and that complainant had become confused in her memory as to the particular occasion of its mention, and the fact that the matter of making another will was talked of on the occasion of the execution of the deed, would aid in producing this confusion.  Or, it may be that defendant misunderstood the complainant, and that she only expressed to him an intention to destroy the will, when he says he understood that she said that she had destroyed it, and that, after all, complainant is correct in saying that she destroyed it on the day the deed was executed.

Another matter in which she is supposed to be contradicted is in respect to the statement which she made several times over, to the effect that on the occasion of the execution of the deed defendant produced a large and lengthy paper, from which he read, and which purported to be a statement in writing made by Pironi, to the effect that he had been in hell for seven years and was going to leave her and not trouble her any more.  It is clear that no such paper was produced, but the deed already signed by Pironi was produced, and his formal acknowledgment of it was taken in complainant's presence, and the defendant did, on that occasion, state that Pironi was going to leave her, and he says that Pironi had previously told him that he had been living in hell for seven years, and it is quite probable that defendant repeated that statement to complainant on the same occasion, in connection with the statement that Pironi was about to leave complainant, and it is not difficult to suppose that this illiterate, ignorant old woman may have got the idea that what defendant was stating about Pironi was contained in the paper, signed and formally acknowledged by him.

Upon the whole, I can find in the case no serious contradiction of the complainant except that found in the defendant's evidence.  On the other hand, it is impossible to avoid the conclusion that the defendant has shown a decided lack of accuracy and frankness in the matter of the agreement with and about Pironi,

which must detract from the value of his statement with regard to the payment of the $1,000.

Reliance is of course placed upon the receipt of the money contained in the deed signed by complainant, but I am unable to give it any serious weight under the circumstances of the case. Judge Garrick, no doubt, undertook to do his duty fully and carefully, and did so to the extent of explaining to the complainant the nature of the deed and of the transaction in general (which, after all, I much doubt if she fully understood), but he did not himself expect any money was to be paid, and it is not at all probable that he called complainant's attention to the circumstance that she was signing a receipt for $1,000, or any other sum of money. He does not so swear, and I do not think it should be presumed. I can therefore give the presumption of payment, arising from the production of the receipt, little or no weight in this case.

The theory of the complainant is, that the defendant, while he felt reasonably confident of the stability of the complainant's feelings toward him, still felt that there might be some difficulty in sustaining a pure deed of gift against her heirs after her death, and therefore contrived the plan of a money consideration and a simulated payment in the presence of a witness for use in such case. On the other hand, it is urged that he would not be likely to resort to such a clumsy contrivance, which could not be carried out except by previous agreement with the complainant, of which there is no evidence.

I have now referred to all the evidence, direct and circumstantial, bearing on the question of the payment of the $1,000, and have tried to give all these matters their true weight, and, after a careful review of the whole case in all its aspects, I am led to the conclusion, that the evidence preponderates in favor of the complainant, perhaps not very strongly, but still decidedly in her favor. This is its effect upon my mind. I cannot but feel that there is less danger of doing injustice to be apprehended from deciding this last issue in complainant's favor than in deciding it against her.

In this connection, one aspect of the case cannot be overlooked—and it is one that is most prominent from defendant's standpoint—namely, the confidential relations which existed between the parties. Defendant declares that this old lady, to whom he had long ago acted as spiritual adviser for a period of three years, remembering the confidence she then had in him, recalled him and treated him with such renewed confidence that she was at once willing and desired, without a cent of compensation, to give him all she had in the world. This state of mind could only have arisen from the confidential relations which existed between the parties, and, in this connection, the expressions found in the letter of the nun are important. The nun writes, "You are the only one in the world she has any confidence in," and again, "One thing, you are the only one she has any faith or confidence in. Poor old creature, she is very unhappy."

Now, in all cases where the person in whom the confidence is reposed receives a benefit from the person reposing it, the law presumes everything against the transaction, and casts upon the beneficiary the burden of sustaining it in any and all its aspects by clear and satisfactory evidence. This is the familiar and well-settled rule, and, in my judgment, it is as salutary as it is well settled. Lord Penzance, in *Parfitt* v. *Lawless, L. R. (2 Pro. & Div.) 468,* says: "In equity, persons standing in certain relations to one another—such as parent and child, man and wife, doctor and patient, attorney and client, *confessor and penitent,* guardian and ward—are subject to certain presumptions when transactions between them are brought in question, and if a gift or contract, made in favor of him who holds the position of influence, is impeached by him who is subject to that influence, the courts of equity cast upon the former the burden of proving that the transaction was fairly conducted *as if between strangers;* that the weaker was not unduly impressed by the natural influences of the stronger, or the inexperienced overreached by him of mature intelligence." The learned judge then proceeds to show that such rule does not prevail in respect to wills.

One of the most important requisites of the validity of these transactions between persons acting under the influence of these confidential relations is, that the party presumably under the influence of the other should have had independent advice from a lawyer, who is devoted entirely to the interest of the party he is called upon to advise, and in whom that party has entire confidence. Perhaps, in this country, advice from a lawyer is not looked upon as so pre-eminently important, but it is of the utmost importance, in my judgment, that whatever advice is given and received should be disinterested and given under such circumstances as to be full and complete, and that the attention of the party about to confer the benefit should be called to all the circumstances which might influence him or her against it. The authorities on this point are abundant. In *Rhodes* v. *Bate,* *L. R.* (*1 Ch. App.*) *257,* Lord Justice Turner says: "I take it to be a well-established principle of this court, that persons standing in a confidential relation toward others cannot entitle themselves to hold benefits which those others may have conferred upon them, *unless they can show, to the satisfaction of the court, that the person by whom the benefits have been conferred had competent and independent advice in conferring them.* This, in my opinion, is a settled and general principle of the court, and I do not think that either the age or capacity of the person conferring the benefit, or the nature of the benefit conferred, affects this principle. Age and capacity are considerations which may be of great importance in cases in which the principle does not apply, but I think they are of little, if any, importance in cases in which the principle is applicable. They may afford a sufficient protection in ordinary cases, but they can afford but little protection in cases of influence founded upon confidence." The rule is further stated, and, I think, correctly, in the English note to *Huguenin* v. *Baseley,* *2 Lead. Cas. Eq.* \*595, as follows: "The conduct of the party benefited must be such as to *sever the connection and to place him in the same circumstances in which a mere stranger would have stood,* giving him no advantage save only whatever kindness or favor may have arisen out of the connection." To the same effect is the language of the American

annotators to that case, and the cases cited by them.　See *Lead'. Cas. Eq. (4th Am. ed.) 1192, 1195.*

In the case in hand, the complainant did, undoubtedly, at the start, have independent and complete advice, but that resulted in a *will* and not a *conveyance*, which will was shortly afterward' destroyed, showing, as I think, that complainant was not then fully satisfied to give all' her property to the defendant.　Then comes the deed, and I must say that its origin, if looked upon as a pure gift, as it must be from defendant's standpoint, is, by no means, accounted for satisfactorily to my mind.　Passing, for the moment, the mystery surrounding the origin of the idea of a conveyance, we find that the deed was prepared entirely by defendant's instruction, and was executed in the presence of the defendant and his counsel, without any opportunity on the part of the complainant to have any preliminary independent advice about the transaction she was about to enter into.　Judge Garrick had never seen the complainant and knew nothing of her except what he had learned from the defendant, and had no private conference with her.　No doubt he explained to her as well as he could the nature of the transaction, and it was all undoubtedly put on the basis of a pure gift, which he then understood it to be ; and, as before remarked, he could not have discussed or explained the matter of the consideration, because he had no expectation that any was to be paid.　He does not appear to have asked her any such questions or made any' such suggestions as a counsel would do who is called in to advise privately and confidentially with a client who has confidence in him and needs and asks his advice as to a proposed transaction.　It thus appears that in none of the aspects of the case were the requisitions of the rule applicable to such cases complied with.　It seems to me that the complainant, laboring as she did under the combined disadvantages of great age and of dense ignorance and inexperience, and dealing with a person in whom she had the utmost confidence, had especial need of, and was especially entitled to and should have had the benefit of a full, free and private preliminary conference with a competent lawyer or business man, who was employed and paid by her, and in whom she had con-

fidence, and who would be devoted to her interests and hers only. If she had had such assistance, if the confidential relations between the parties had been suspended and the transaction carried through "as between strangers," as it should have been, it is probable that we should not now be confronted with the present uncertainty as to the payment of this sum of $1,000. That it was not so done from an equitable standpoint, is, the fault of the defendant.

The precise difficulty which confronts the defendant is this: He declares that the transaction was started as one of pure gift, and was afterward changed into one of partial consideration; and he does not show that either as a pure gift, or as founded on a partial consideration, it was fully understood by the complainant, or to the extent it would presumably have been understood by her if she had had the benefit of such independent advice as I have indicated; while, on the contrary, as I have shown, it did not, as a matter of fact, originate as a pure gift, but was based on a consideration which she greatly prized and which has wholly failed; and the defendant has not, in my judgment, fully overcome the burden cast upon him by law under the circumstances of proving that he actually paid the partial consideration.

The result is, that the conveyance in question must be set aside and a reconveyance decreed. The complainant is entitled to costs.