EDMUND H. REEVES, administrator, &c.,

*v.*

IDA J. WHITE et al.

[Submitted April 29th, 1915. Decided July 17th, 1915.]

1. Where an assignment of leases was recorded and the recorded in-strument delivered to the donee, there was a completed gift, notwithstanding the donor did not originally intend the gift to take effect until his death.

2. A gift of his property and business by an aged man, afflicted with fatal illness and unable to earn a living except through the business, to the wife of his adopted son, will not be upheld where the donor impoverished himself, unless he took independent advice; for, though the donor was in possession of his faculties and knew his own mind, the donee, who was in the prime of life and to whom he owed a great debt of gratitude for her loving care, occupied the dominant position.

3. Where an aged man, afflicted with fatal illness, gave all of his property to the wife of his adopted son, the fact that the scrivener who prepared the conveyance called to his attention that it would take effect during his life is not independent advice, it being apparent that the donor, who mistrusted the donee's husband, did not realize that in case of her death before him the husband would take the property.

4. Where a court of equity set aside, as improvident, a gift by an aged man to the wife of his adopted son, and the next of kin of the deceased took the property, they will be compelled to do equity and to compensate the donee for her care of the deceased and as well to pay a mortgage on the property, which she had discharged.

*Mr. William C. French* and *Messrs. Bergen & Richman,* for the complainants.

*Mr. Edmund Wilson* and *Mr. J. Otto Rhome,* for the defendants.

BACKES, V. C.

The object of this bill is to set aside a gift *inter vivos* on the ground of improvidence. Joseph White died at the age of seventy-six. Two years before, on October 5th, 1909, he as-

signed to Ida J. White three leases of lands upon which the "Hotel Spray View" in Ocean Grove stands. At the same time he executed to her a bill of sale of the furniture in the hotel, conveyed to her his real estate in Florida, and transferred into their joint names his bank account. He, in fact, gave her all he possessed.

The bill is filed to set aside the assignment of the leases only; and in avoidance it sets up confidential relation, dependence and want of competent and independent advice. Fraud is not charged. The defence alleged is that the assignment was made in consideration of many years of services rendered, and pursuant to a promise to thus compensate; and that the donor had independent advice.

If the assignment was in fact the fulfillment of such an agreement, there was no proof of, nor any attempt made to establish, the contract—perhaps due to the incapacity of the donee as a witness, and an inability to supply it from other sources. From all that appears, the donee rendered the services in, and as a member of, the donor's household, from which alone, the law does not imply a promise to compensate. *Disbrow* v. *Durand, 54 N. J. Law 343.* The assignment can only be upheld, if at all, as a gift, for it is manifest that it was a bounty, and that the donor was actuated by motives of affection and gratitude, and a desire to remunerate.

Ida J. White, the donee, is the wife of the conventionally—not legally—adopted son of Joseph White, the donor. He was taken when an infant, and lived with his adopted parents until they died. When he married, his wife, and afterwards a daughter born to them, now sixteen years of age, became members of the donor's household. White ran the hotel; the son acted as an under-steward and his wife assisted generally. In 1906 the donor's wife died and from that time on, at least, the donee assumed the duties of housekeeper and in every way possible co-operated with the donor in conducting the hotel. Up to the day of his death the donor purchased the supplies for the hotel and attended to the finances. Age and physical ailments had not perceptibly impaired his mental faculties. He was strong of will and sturdy of character. Physically, he suffered from ar-

terior sclerosis and angina pectoris, and from 1906 on his condition was precarious, in the sense that during seizures he was liable to die and in fact he dropped dead on the highway. The spells were frequent—weekly and oftener—and due to them and age, his vital forces gradually lessened. During this time it was not safe for him to be alone; he was the constant care of the donee. He died childless, leaving nephews and nieces, or their descendants—forty-one in all—as his next of kin.

On October 4th, 1909, Mr. White directed his real estate agent to draw the assignment of the leases and a bill of sale for the furniture, stating that he wanted to give all of his real estate and personal property to the donee. The next day he called, executed the documents and took them away. In May of 1911 he brought them back, with the request to have the assignment recorded in the county clerk's office, and approved by the Ocean Grove Association. After the assignment was recorded and approved, the agent returned it to Mr. White, who, in his presence handed it to the donee, saying, "Here, Ida, here's the deed for this property; now take it and take care of it."

There is considerable controversy in the arguments—not much in the proofs—as to whether the assignment had been delivered, and delivered with donative purpose. Upon this, there was no issue raised by the pleadings, and indeed the frame of the bill assumes both factors to be present, but as it goes to the very root of the donee's right, it is to be regarded as within the general scope of the cause.

That there was a manual tradition of the document is established. Mr. White was told at the time it was drawn that an actual physical delivery of the paper was necessary in order to make the gift legal. The daughter of the donee, although then only eleven years of age, says that about that time she saw her grandpa give the assignment and bill of sale to her mother. Mr. White declared in 1910 to at least a half-dozen of the witnesses, in effect, that he had given or deeded the property to his daughter Ida, and we have the real estate agent's description of a confirmatory delivery in May, 1911.

The testimony leaves no room to doubt an actual handing over.

Whether there was a delivery with intent to divest the title, is debatable. The language of the deed and its formal presentation would, indeed, import a complete donation. But Mr. White had planned to have the gift operate testamentarily. At the time he gave instructions for the assignment and was told that it had to be delivered to be effectual, he inquired of the agent whether his daughter Ida could get the benefit of it at his death if he executed it and laid it away in his safe until that time. He evidently followed, in form, the advice, and made delivery, but evaded its subtsance. He may have understood, or probably reasoned, that although a formal delivery was essential to a gift, it was only so as a necessary step in making it effective at his death. He did not at that time, it is quite certain, intend to surrender his dominion. He hired a safe-deposit box in the name of the donee and himself, to which each had access. From this box the bill of sale, enclosed in an envelope, was taken after this suit was brought. This envelope is the same in which the real estate agent enclosed the assignment and the bill of sale immediately after they were executed, and gave to Mr. White. It is a fair inference that the assignment was in the envelope when it was first put in the safe-deposit box. On the envelope is inscribed in the donor's handwriting: "5 day of October 1909, for Ida J. White." This superscription—in the prospective; keeping control of the documents; the frequent expressions of the donor to numerous witnesses that he had given his estate to his daughter, so that she would have it at his death, and the fact that he thereafter used the hotel property as his own, and therein carried on the hotel business, as before, all confirm the conclusion that Mr. White initially did not intend to, and in fact did not, part with his ownership. But, this interpretation of his conduct, as bearing upon his intent, loses its importance, because, it appears clearly and satisfactorily that in May, 1911, that which was theretofore left undone was consummated. The recording of the deed and its redelivery to the donee are persuasive and cogent proof of his intention then to vest the title absolutely in the donee. The recording of the assignment was a public declaration of his

purpose to irrevocably part with the hotel. The delivery of the deed completed the gift.

The next inquiry is—can this gift be upheld in the face of the rule of independent advice? The donor was aged, afflicted with a fatal illness, and unable to earn a living in any capacity outside of his established business. The donee was a young woman thirty-nine years of age, who had faithfully devoted the best years of her life to him and his wife and in his affairs. For her, he very naturally had unbounded affection. His gratitude was of the deepest. In her he reposed great confidence, and as age advanced and his physical ailments became more aggravated, his dependence upon her increased. In these circumstances he gave to her all that he had—stripped himself. While the law does not forbid to the aged the right to thus voluntarily change from a condition of affluence to one of poverty, yet it nevertheless jealously guards such action of the old and infirm, where a relation of trust and confidence exists, and before it gives sanction to such a gift, demands that it be shown that the donor fully comprehended its legal, as well as its practical, effect. This case is absolutely free of fraud and of undue influence. The mind of the donor was strong, his daily conduct normal, and the gift was well earned. All of these features are not to be found in any of the cases I have examined, where the rule has been applied to the class of confidential relations to which the present one belongs. The most conspicuous distinction is that in those cases the conveyances were pure gifts, while here the gift was by way of compensation. I have anxiously, but vainly, sought to, on authority, differentiate on these grounds collectively, for I confess my sympathies are entirely with the donee, but am forced to the conclusion that the application of the rule is inexorable whenever apparent improvidence calls it into play. It is the settled policy of this state, whatever it may be elsewhere, that whenever a relation of trust and confidence exists, and the inequality favors the donee, whether that inequality be inferred from the legally recognized relationships or is established by proof of actual dominance or of dependence, and where the case is free from fraud and undue influence, a gift of the whole (or the bulk if it results in im-

poverishment) of the donor's estate will not be sustained, unless it clearly appears that he well understood the effect and consequences of his act; and the indispensable evidence of this understanding is that he had competent and independent advice.

In *Slack* v. *Rees,* '66 *N. J. Eq. 447,* Chief-Justice Gummere says of the rule:

"Its purpose is not so much to afford protection to the donor against the consequences of undue influence exercised over him by the donee as it is to afford him protection against the consequences of voluntary action on his part, induced by the existence of the relationship between them, the effect of which, upon his own interests, he may only partially understand or appreciate."

In *Post* v. *Hagan, 71 N. J. Eq. 234,* Mr. Justice Garrison says:

"That a person already aged or infirm or otherwise dependent should give to the one upon whom he thus depends practically his whole living beyond recall, and at the very time when apparently he had most need to retain it, raises, in the mind of a chancellor the presumption that the donor may not have appreciated the irrevocable character of his act or that he did not foresee its legal consequences to himself. This presumption of apparent improvidence gives rise to the special rule followed in *Slack* v. *Rees* which may be called the rule of independent advice. By force of this rule, if a person upon whom another has in fact come to be dependent accepts a gift from such dependent person of all of his or her estate, a court of equity, moved by the apparent improvidence of such a gift, casts upon the donee the burden of showing that the donor had the benefit of proper independent advice. Proper independent advice in this connection means that the donor had the preliminary benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was furthermore so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and confidently as to the consequences to himself of his proposed benefaction."

The defendants' counsel urges that the donor had not surrendered the dominant position and that, therefore, the rule

lacks application. But, it seems to me that the donee's ascendency is a necessary inference from the condition of dependence, which manifestly existed. The refusal of the court to apply the doctrine in the case of *James* v. *Aller, 68 N. J. Eq. 666*, to which I have been referred, is not relevant. There, the donor, although he gave all of his property to his children, was in the prime of life and was steadily earning from one to three hundred dollars a month, which caused the chief-justice to remark, that "It may well be doubted whether a man in such a situation necessarily acts improvidently in giving to his children the property which he has then accumulated," and he held upon the facts of the case that the father of the family occupied the dominant position.

It is next contended that the gift should not go down because the donor had in fact competent and independent advice. The real estate agent gave the only testimony on this point. When Mr. White called to have the assignment and bill of sale drawn, he asked him whether he was going to give away all of his property, to which White replied that that was his desire and just what he wanted to do. And later, upon the same occasion, the witness suggested, "You understand, Mr. White, that you are conveying the 'Spray View Hotel' and contents to Ida J. White, and once you convey it, it is out of your hands," to which he answered, "I understand that thoroughly and that is my desire and wish absolutely." He also told Mr. White, "He was stripping himself of everything that he possessed in Ocean Grove." This witness was very active in the defence of the suit, and his testimony may be slightly colored, but giving it full credence, it amounts to no more than that he brought to Mr. White's attention the effect in law of the proposed transfers. His advice was not sought, and whatever information he imparted did not meet the standard of "advice" fixed in cases of this kind. The donor was single-minded; he looked no further ahead than providing for his daughter-in-law, and through her for his adopted son, and their child, after his death. He, of course, trusted her implicitly and felt that he and his property were safe in her hands; but, did he stop to think, and was he advised of the possible dire consequences to him if the daughter

died in his lifetime? Did he realize that his adopted son, whose intemperate habits had caused him much distress, and in whom he had no confidence, would then be in control of his fortune, and that upon this irresponsible he would be reliant for subsistence? Or, did it occur to him that the discharge of duty of a guardian for the infant granddaughter, if she inherited, would sweep from him all means of support? I cannot conceive that he did. The assignment must be declared invalid.

The next of kin, many of whom perhaps the donor never saw and some of whom he probably never heard of, and whose claim to the estate rests solely upon the fact that a strain of his blood courses through their veins, will not, however, be permitted to have the benefit of a decree without doing substantial justice, or as nearly so as this court can compel them to do. They, through their representative, are here seeking equity and they will be compelled to do equity.

"The court of equity refuses its aid to give to the plaintiff what the law would give him if the courts of common law had jurisdiction to enforce it, without imposing upon him conditions which the court considers he ought to comply with, although the subject of the condition should be one which the court would not otherwise enforce." *Pom. Eq. Jur.* § *385.*

A refusal to invoke this wholesome and beneficial principle would be deplorable, and to permit the next of kin to escape with this large estate, without requiting the defendant; to send her away empty-handed and unremunerated for her many years of labor and toil—to be stranded in her old days—would shock the conscience and every sense of decency and propriety. The error of the donor should not stand in the way of giving the donee her just dues, the estimate of which he fixed by his gift. She is entitled to be compensated, and fully and amply, and in the measuring scales should be thrown, until they bear down heavily, the love and affection which inspired her, and which she bountifully bestowed, during the years she sacrificed in the care of this old man and his wife. The financial standing of the donor and his appraisal of the donee's attentions and

solicitude must also be considered. What she ought to have, I will fix upon further hearing; or, if both parties desire, they may take a feigned issue to a jury for an advisory verdict.

It appears that before this bill was filed the defendant paid off a $3,000 mortgage on the hotel. This money the complainants will have to restore.

Costs will not be allowed. *Peer* v. *Peer, 11 N. J. Eq. 432.*