WILLIAM BENSEL

*v.*

WILLIAM O. ANDERSON et al.

[Decided December 24th, 1915.]

The complainant, an old man of ninety years, owning a small estate and living with and dependent upon his children and son-in-law, agreed to become a joint endorser of commercial paper, without limit in amount, to finance a business about to be engaged in by the son-in-law and the co-endorser. The enterprise failed, with paper outstanding, jointly endorsed, far in excess of the value of the complainant's property.—*Held,* that the agreement and endorsements were obtained under the influence of confidential relations existing between the complainant and the son-in-law, of which the co-endorser was charged with notice, and as to the co-endorser the agreement and endorsements were void for want of intelligent understanding by the complainant and absence of competent and independent advice; *also, Held,* that a judgment recovered by the co-endorser on the joint liability is invalid, execution whereof would be restrained; and that third parties, innocent holders of the paper, would be compelled to exhaust their remedy against the co-endorser before resorting to the complainant's property.

*Mr. Aaron V. Dawes* and *Mr. James J. McGoogan,* for the complainant.

*Mr. Frederic R. Brace,* for the defendant Anderson.

*Mr. W. Holt Apgar,* for the defendant First National Bank.

BACKES, V. C.

The complainant, William Bensel, ninety years of age, retired from the butcher business some twenty-five years ago, with savings of about $10,000, invested in a home and a small frame house nearby. During his retirement, he has occupied his home with an unmarried daughter; another daughter, Mrs. Howell, and her husband living in an adjoining house, and Samuel Kline, who married a third daughter, lives in one in the rear.

They all take their meals at the father's house, and have done so for many years. The means for the upkeep of the home, the supply of the table and the needs of the parent, are provided by the married daughters, who also assist in the household; the funds, of course, being furnished by the husbands. Samuel Kline was the man of the house, who, in his daily association with the old gentleman, assisted him in his personal affairs, which infirmities, due to extreme old age, made necessary, and entertained and amused him—not exclusively, but in common with the daughters. He was his adviser in whatever little business transactions there were, and shared his confidence. Kline was engaged in manufacturing barbers' chairs and supplies, and Bensel was his accommodation endorser to the amount of $4,650, when, in 1912, Kline and Anderson organized the Samuel Kline Company, Kline contributing $2,500, the estimated equity of his business, as against $2,500 in cash put up by Anderson. Each held equal shares of the capital stock of the company, and together they managed the concern. They continued until 1914, when Anderson withdrew. Anderson is now the owner, but just how he got control of the company does not appear. During the joint management, Bensel became an accommodation endorser with Anderson on the company's paper to the amount of $23,400, discounted by the First National Bank of Trenton. When Anderson withdrew, the corporation executed to him a chattel mortgage upon all of its then and after-acquired property, conditioned that it should be void upon the payment of the notes so endorsed by Anderson, and his discharge from liability thereon. On the mortgage Anderson has so far realized $5,000, out of a possible value of the mortgaged property of $8,000. The mortgage is now held by the First National Bank, having been assigned to it as collateral security. The accommodation paper was all dishonored, notice of which was duly given. One of the notes, dated March 27th, 1914, at four months, for $5,000, was redeemed by Anderson, upon which he recovered judgment against Bensel in the supreme court for one-half of the face, plus interest and costs. The First National Bank brought suit against Bensel and Anderson as endorsers upon two notes for five and eight thousand dollars, respectively, and at the request of Anderson entered judg-

ment against Bensel only, and thereunder levied upon the latter's property, and was about to make its money when this bill was filed. The object of the bill is to compel Anderson to pay the notes and judgment of the bank out of his own funds and those had and derivable from the proceeds of the chattel mortgage, in relief of the complainant, and pending the effort, stay collection by the bank out of the complainant's property. Anderson is solvent and there is no danger on this score of loss to the bank. I take this to be so, because of the bank's prosecution of Bensel alone, and its willingness to forego proceedings against Anderson.

When Kline proposed to Anderson to join him in business, he was in a precarious condition for lack of funds and credit, and unable to continue alone. For the purpose of raising capital to take up outstanding obligations upon which Bensel was endorser and to float the new project, it was arranged between the two that Bensel and Anderson should jointly endorse commercial paper for discount. By appointment made by Kline, Anderson met Bensel at his house, and what occurred there is best told in Anderson's language:

"I simply stated I came to see Mr. Bensel to talk the matter of Mr. Kline and myself going into business together, and to see if it was agreeable to him to continue as endorser, equally, on paper with me; but that, whereas, now he was personally liable for the entire amount, he would then be liable for half, and that the paper given with his endorsements would be used to lift paper on which he was personally endorsing for Kline, and in such use of the business as might be deemed necessary. I asked Mr. Bensel at the time as to his financial responsibility; he told me he owned the property, 328 North Broad, and the property on Montgomery street. The property on Montgomery street he said was mortgaged for $1,200. As to the value of the property on North Broad street, there was nothing particular said; I put my own value on it."

The value of both properties Anderson estimated at from ten to twelve thousand dollars. Nothing was mentioned of the amount to which the new line of paper was to be issued. Thereafter the Kline company was formed, and from time to time notes were taken by Kline to Bensel for his endorsement, until the net accumulations amounted, as above stated, to over $23,000.

The theory upon which the case is presented, although scantily charged in the bill, but, in view of the answer, sufficient to ad-

vise the defendants of the gravamen of the complaint, is that the endorsements of Bensel, resulting in his present predicament, were procured by the undue influence of Kline, to the knowledge of Anderson—an undue influence presumed, and not effectually rebutted—from a relationship of trust, confidence and dependence existing between Bensel and his son-in-law. The determination of the issue, if it were confined to Bensel and Kline, would involve no difficulty in condemning the transaction as fraudulent. For here we have a tottering old man, in years far beyond the allotted time, dependent for his temporal wants entirely upon his children, and in a large measure upon his son-in-law, a member of his household, in whom he undoubtedly reposed great confidence, involving himself, at the latter's instance, in obligations which in nowise could have benefited him, and if permitted to stand would result in sweeping away his meagre competence, leaving him impoverished, a subject of charity, or, possibly, a public charge. From such calamity equity, in a measure, shields him. In all transactions between parties occupying relations, whether legal, natural or conventional in their origin, in which confidence is naturally inspired, or, in fact, reasonably exists, the burden of proof is thrown upon the person in whom the confidence is reposed, and who has acquired an advantage, to show affirmatively not only that no deception was practiced therein, no undue influence used, and that all was fair, open and voluntary, but that it was well understood. *Hall* v. *Otterson, 52 N. J. Eq. 522; Same Case on appeal, 53 N. J. Eq. 695.* Where parties hold positions in which one is more or less dependent upon the other, courts of equity hold that the weaker party must be protected, and they set aside his gifts if he had not proper advice, independently of the other. The presumption against the validity of the gift is not limited to those instances where the relation of parent and child, guardian and ward, or husband and wife exists, but in every instance where the relation between the donor and donee is one in which the latter has acquired a dominant position. *Haydock* v. *Haydock, 34 N. J. Eq. 570.* And, where one so situated is despoiled of all his property, a rule putting an additional burden upon the beneficiary is brought into play. Mr. Justice Garrison explains it with marked clarity thus

(*Post* v. *Hagan, 71 N. J. Eq. 234*) : "That a person already aged or infirm, or otherwise dependent, should give to the one upon whom he thus depends practically his whole living beyond recall, and at the very time when apparently he had most need to retain it, raises in the mind of a chancellor the presumption that the donor may not have. appreciated the irrevocable character of his act or that he did not foresee its legal consequences to himself. This presumption of apparent improvidence gives rise to the special rule followed in *Slack* v. *Rees,* which may be called the rule of independent advice. By force of this rule, if a person upon whom another has in fact come to be dependent accepts a gift from such dependent person of all his or her estate, a court of equity, moved by the apparent improvidence of such a gift, casts upon the donee the burden of showing that the donor had the benefit of proper independent advice. Proper independent advice in this connection means that the donor had the preliminary benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was furthermore so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and confidently as to the consequences to . himself of his proposed benefaction." These beneficent rules of equity have been chiefly employed in cases of outright gifts, but their underlying principles call for their application as vigorously, in circumstances where the subject, by enmeshing and entangling himself, has his property taken from him by legal process, as where he gives it away. The result is the same. And, when inspired by confidential relation, the presumption of undue influence is as much excited in the former as in the latter instance, and the rules applicable to the one are as fitting to the other.

The fraud actually perpetrated upon this old man emphasizes the necessity for the rules, although here the fraud is established as a fact. Bensel's endorsements covered a period of two years, before he discovered he was swamped by their enormous total. From time to time, when called upon by his son-in-law to endorse notes, he was told they were renewals, when, in fact, they were original instruments increasing his obligations. He kept no

record or check of the notes, paying little heed to number or amounts, and endorsed indiscriminately, in blind subjection to confidence, implicitly relying upon the representations. Kline says that he was moved to the imposition by Anderson, but this is denied, and, in the face of his confessed perfidy, I must disregard the accusation.

The important inquiry in the case then is, is the vice in Bensel's undertaking—the constructive fraud—chargeable to Anderson? The position taken by Anderson is that he drove a direct bargain with Bensel, free from any taint of undue influence which Kline may have exerted. My impression of his motive in interviewing Bensel does not accord with his avowed object; and this is my analysis of his conduct: Anderson apprehended that large capital would be necessary to successfully swing the enterprise. For this purpose, Bensel's credit was not necessary at the bank; Anderson's standing was sufficient. He was willing to take a chance which held out prospects of large profits, but disinclined unless someone shared with him the responsibility. To Bensel he went, not to deal, because Kline had already offered Bensel as a partner, but simply to confirm Kline's assurance and to appraise Bensel's material worth to him if the venture proved to be a failure. Having secured one, and made an estimate of the other, he and Kline proceeded to "endorse" this helpless old man out of all his worldly goods. Now, is he any less amenable than Kline? He saw for himself that Bensel was a complacent feeble old man, simple in his habits and content to live out his few days happily surrounded and cared for by his children. He knew his manner of living and how he got it; that his income was insufficient to maintain him, and that support by labor was out of the question. Kline's apparent unlicensed proffer of Bensel as a joint venturer, and Bensel's ready acquiescence in the scheme of suretyship without limit, and disaster beyond redemption, were calculated to arouse suspicion that Kline's sway of Bensel was a subtle factor. And, later, the ease with which the endorsements were forthcoming, must have carried conviction that none but Kline could have persuaded Bensel to such folly. It is far from my intention to intimate that a person advanced in years and dependent, cannot bind himself as an ac-

commodation endorser, or that an innocent holder would not be protected, or that Bensel had not the right to do just what he did in this case, for while the law incapacitates youth from contracting, it has not fixed a corresponding disqualification upon the decline of life, but equity succors the old and infirm laboring under a form of duress which it alone recognizes, by demanding of him in a position to exert it, and those who use him as a medium for advancing their own interests, satisfactory proof that the transaction was well understood and that it was the result of an independent judgment. Some of the authorities go so far as to require independent advice in all cases, but, by analogy to the authorities of this state relating to donations, it seems to me that this should not be exacted, unless all is sacrificed, and then on the notion of apparent improvidence. Anderson, therefore, cannot be permitted to go away with the complainant's estate, without meeting the equitable requirements. Now, has he done so? Bensel denied ever having seen or dealt with Anderson, but I am inclined to believe he did, and that the conversation made little impression upon him and that he has forgotten. At the hearing, he was unable, apparently, to tell very much about any of the affair. As related by Anderson, it appears that at the time of the agreement, Anderson made the proposition of joint suretyship, to which Bensel gave assent. Anderson assumed that he understood, but the question is, was the matter understandingly explained? Bensel, undoubtedly, was given the impression that by the new arrangement, his then liability would be cut down by one-half, but was it brought home to him that it was also to expand to the limit fixed by Anderson's estimate of the amount to which Bensel's property could be made to respond? For, beyond that length Anderson designed not to go, and he did not; he stopped there, obviously because he had exhausted the old man's financial capacity. Was it Bensel's conception that a compliance with the agreement to endorse meant that on default he would be expected to pay the Kline output of paper; that he was really financing the concern; and that failure of the Kline company meant his utter ruin? It is not so established by the evidence, and it is quite evident that no effort was made to bring these possible dire consequences within his comprehension. Anderson's

duty did not stop short of this. The old gentleman was led to understand that Anderson was a man of much wealth, and the inference is not strained that he believed he was standing back of Anderson's business, and that no loss could befall him. Courts of equity have been prone to disallow contracts in favor of third parties, where advantage is derived through confidential relations, and the opinions plainly indicate how far the beneficiary must go to overcome impeachment on this ground. The authorities, in instances of duress by parents, where parental influence was presumed to prevail after the child had arrived at legal age, are especially apposite, inasmuch as the complainant's advanced years and dependency put Kline in the ascendant position. Other cases where trust and confidence subsisted are also in point. In *Archer* v. *Hudson, 7 Beav. 551; 49 Eng. Reprint 1180,* a niece, just of age, entered into a security for her uncle who had brought her up, upon the strength of which he was permitted to overdraw his account with his bankers. The bank's manager participated in obtaining the security and explaining its effect. In relieving the plaintiff from the obligation, Lord Langdale, master of the rolls, said: "It therefore does not appear that this young lady was ever severed from the influence which the uncle and aunt had over her, so as to enable her to form an adequate, full and independent opinion as to what she ought in prudence to have done. I do not mean to say that if this young lady had her trustees, or some friend or relation of the family, or somebody interested in her welfare, to advise and consult with, in the absence of the uncle and aunt, that the circumstance of her situation, and the circumstance of the uncle's situation, might not have been such that this court would have said that, having entered into this liability, she should be held by it. It might have been so; but to say that Mr. Hauxwell, the agent of the bank, a person with whom the uncle was dealing, the person through whom he is carrying on his business as a customer of the bank, by explaining to an inexperienced young woman who had just attained her age of twenty-one years the meaning of this note, offered anything like such a protection as would secure to her that free and independent judgment which she had a right to exercise, seems to me to go far beyond anything which has been proved in this

case. It does not appear to me, taking this transaction as it stands upon the evidence before me, that it can be supported." Similar cases are those of *Maitland* v. *Irving, 15 Sim. 437; 60 Eng. Reprint 688; Maitland* v. *Backhouse, 16 Sim. 58; 60 Eng. Reprint 794.* In *Espey* v. *Lake, 10 Hare 260; 68 Eng. Reprint 923,* the plaintiff, a young lady of twenty-two, who had lived with her step-father from infancy, became surety on his note for £500, on which he secured a loan of that amount. In restraining execution of the judgment obtained by the lender, Lake, Vice-Chancellor Turner said: "I take it to be quite clear that the principles of this court go to this extent—that in the case of a security taken from a person just of age, living under the influence and in the house of another person, with a relationship subsisting between such other person, and the person from whom the security is taken, which constitutes anything in the nature of a trust, or anything approaching to the relation of guardian and ward, or of standing *in loco parentis* to the surety, this court will not allow such security to be enforced against the person from whom it is taken, unless the court shall be perfectly satisfied that the security was given freely and voluntarily, and without any influence having been exercised by the party in whose favor the security is made, or by the party who was the medium or instrument of obtaining it." And to Lake's disclaimer of any part in the transaction, and that he had left it entirely to the step-father, he replied: "In the application of the principles of the court, I see no distinction between the case of one who himself exercises a direct influence, or of another who makes himself a party with the guardian who obtains such a security from his ward. The defendant, Lake, left it to Speakman, who had influence over his young ward, as she may be called, to induce her to join in the security, thereby placing her more directly under undue influence than if he had applied for the security himself. Such a security cannot be maintained consistently with the principles of this court." In *Savery* v. *King, 5 H. L. Cas. 627,* a son's pledge for his father's debt was set aside, although the son was of legal age, on the ground that he was still under his parent's influence—a fact well known to the creditor. In *Berdoe* v. *Dawson, 34 Beav. 603; 55 Eng. Reprint 768,* two sons mortgaged

their estate to secure a debt of the father. They were the age of twenty-five and twenty-three, respectively, and lived with the father. In setting aside the mortgages, the master of the rolls, Sir John Romilly, said that, "When a person executes a deed by which his father, or any other person nearly related and connected with him, or who, from any other cause, has necessarily a considerable influence over him is benefited, then the person who claims the benefit of that deed is bound to establish two things— he is bound to establish, in 'the first place, that the person who executed the deed knew what he was about when he executed it; and, in the next place, he is bound to show that it was made of his own free will, and unbiased by and without being subject to that influence which he could not easily resist. * * * The cases upon the subject are exceedingly strong in showing that this sort of security cannot be relied upon." In *Sercombe* v. *Sanders, 34 Beav. 382; 55 Eng. Reprint 682,* the plaintiff, a younger brother, upon attaining twenty-one, mortgaged his share of his inheritance from his father, to secure the debt of his elder brothers, by whom he had been raised. It was set aside for undue influence presumed. In *Bischoff's Trustee* v. *Frank, 89 L. T. R. 188,* a wife executed a guarantee in favor of her husband's creditor, to secure his debts then due, and a present advance of £500 and future credits limited to £1,500. The creditor and his solicitor made the arrangements with the wife, but it was held that the relationship of husband and wife was one where, in the case of a large voluntary benefit, influence was presumed to exist, and that the transaction being challenged, the burden was on the donee to prove that the nature of the guarantee was well understood and free from the influence of the husband, and that in the absence of independent advice, this had not been discharged; and, further, that the creditor was sufficiently put on inquiry, to be affected with the equitable flaws in the transaction. In *McMackin* v. *Hibernian Bank (1905), 1 Ir. Reps. 296,* a daughter who had recently become of age, and to whom was explained the transaction, consented to become surety for her mother's debt. On a bill filed, a judgment recovered upon the guarantee against the daughter was declared void on the grounds of undue influence presumed from parental control and not rebutted by proof

of independent advice. *O'Connor* v. *Foley (1905)*, *1 Ir. Reps. 1*, involved endorsements of promissory notes given by youthful persons as security for debts of relatives by whom they had been raised. The court, in granting relief against the holder, upon the ground of undue influence of the relatives, said: "Again, the rule is that in the application of the principles of the court there is no distinction between the case of one who himself exercises a direct influence, and of another who makes himself a party with the person who exercises the undue influence. *Kerr 168.* These are legal commonplaces—truisms, which constitute the very lifebreath of our system of equity." In *Noble* v. *Moses Brothers, 81 Ala. 530*, the doctrine is discussed and applied, and some of the above, and many other cases cited in support. The principle upon which these authorities rest are, it seems to me, applicable to the circumstances under consideration.

In granting the complainant relief it is not necessary to, nor do I, impute to Mr. Anderson any intentional wrong-doing or actual fraud. The fact that he staked his own credit, and is a heavy loser of the defunct company, by reason of his endorsements, is sufficient refutation. In disposing of the issue against him, consideration is given only to the equitable rules above alluded to, which are held not to be satisfied by the proofs and that for failure of evidence manifesting a clear understanding by the complainant of the nature and consequence of his act, and because he had not independent advice, Anderson cannot retain the benefit of his contracts, which otherwise he would be entitled to.

The claim that at the time of the contract Bensel was liable for $4,650 on endorsements for Kline; that he was relieved to the extent of one-half by the joint endorsements, and that therefore a valuable consideration moved to him, cannot be seriously entertained. The circumstance may have been one of the allurements of the transactions, but it certainly has no part in the present equities. These obligations were paid off by the Kline concern, as assumed, in payment of the property turned over by Kline. *Heid* v. *Vreeland, 30 N. J. Eq. 591.* At that time Kline had sufficient to pay his debts, and more, by at least $2,500, which could have been, by legal process, appropriated to the liquidation

of the debts upon which Bensel was then guarantor. *Sullivan* v. *International Baking Co., 60 N. J. Eq. 80.* And, so it is plain to be seen that Bensel gained nothing.

The First National Bank is an innocent holder for value and, of course, is not affected, except that in executing judgments to make its debt, it must first resort to the Kline company and Anderson's property, and if there is any deficiency, recourse may be had to Bensel. *Philadelphia and Reading Railway Co.* v. *Little, 41 N. J. Eq. 519; Kidd* v. *Hurley, 54 N. J. Eq. 177; Holcombe* v. *Fetter, 70 N. J. Eq. 300.*

The complainant is entitled to a decree, but without costs.