This is a suit for separate maintenance. By his answer the defendant admits that the marriage took place as charged, but denies that it is presently subsisting. He also denies complainant's charges of abandonment and refusal and neglect to maintain and provide, and sets up as special defenses that on November 2d 1942, he was granted a decree of absolute *Page 10 
divorce against complainant in the State of Nevada, that said decree "adopted, ratified and confirmed" an agreement made by the parties on July 3d 1942, whereby complainant waived and relinquished all financial claims upon him, past, present and future, that by reason thereof complainant is "estopped and barred" from maintaining her present action and that her suit is for those reasons not brought or prosecuted in good faith.
The parties were married on February 23d 1942, and cohabited at the City of Red Bank in this state until their final separation on July 5th, 1942, a period of less than five months. There are no children. It is immaterial to inquire into the reasons for the separation or to weigh the faults of the respective parties since neither accuses the other of any marital offense amounting to ground for divorce. Suffice it to say that there was constant quarreling, culminating on July 1st, 1942, in a parol agreement between them that defendant would procure a divorce without opposition and that complainant would release him from all financial obligation to her. The evidence indicates that the defendant was the aggressor in proposing and advocating that arrangement and that complainant assented thereto unwillingly, her subsequent expression of desire that it be carried out having been inspired by a sense of pique and injured pride rather than through any deliberate, free choice.
On July 2d 1942, defendant took complainant to the office of his New York attorney, who was also a friend of long standing of the defendant but with whom complainant was but casually acquainted. To him they both in each other's presence made known their intention. In an effort to bring about a reconciliation he advised them to think the matter over further. On the following day the parties again attended together at the lawyer's office and reiterated their determination to go through with their plan, whereupon the written agreement set up in defense of this suit was drawn and executed, as follows:
"AGREEMENT made and entered into the day and year written below by and between MAX WOLFF, residing at Cooper Boulevard. Red Bank, *Page 11 
New Jersey (hereinafter referred to as the `husband') and MIRIAM SIEGEL WOLFF, residing at Woodstock, New York (hereinafter referred to as the `wife'),
WITNESSETH:
WHEREAS, the husband and wife were married in Elkton, Maryland on the 23rd day of February, 1942, and have resided at Cooper Boulevard, Red Bank, New Jersey, since that date, and
WHEREAS, there is no issue of the said marriage, and
WHEREAS, because of the unhappy and irreconcilable differences which have arisen between the husband and wife they have separated prior to the date of this agreement, and since such separation have been and are now living separate and apart, and
WHEREAS, they each believe that it will be best for them to continue to live separate and apart for the rest of their lives, and
WHEREAS, the husband and wife desire to enter into this agreement for the purpose of setting forth in writing their intention to continue to live separate and apart and for the purpose of making arrangements therefor upon the terms and conditions hereinafter set forth,
Now, THEREFORE, in consideration of the mutual covenants herein contained, and for other good and valuable considerations, the parties hereto mutually agree as follows:
1) The husband and wife shall have the right to live separate and apart, each from the other, during the remainder of their lives, and each shall be entirely free from the marital control or authority of the other as if each were single and unmarried, without any restraint or interference whatsoever, either direct or indirect. Neither the husband nor the wife shall, at any time, sue the other or suffer the other to be sued in any action for separation by reason of their living separate and apart as aforesaid. Neither the husband nor the wife shall make any claim upon the other for marital or nuptial rights, and neither shall in any way molest, annoy, hinder, or interfere with the other in his or her life or business in any manner whatsoever.
2) The husband and wife each discharges, releases, and waives any and all claims which each may have against the other by reason of any matter, cause, or thing whatsoever from the beginning of the world to the date of this agreement, except such obligations as are set forth herein. The wife hereby specifically releases and discharges the husband from any and all obligations to maintain a home for her, to make any payments to her, to support her, to contribute to her support, or to pay any settlement, counsel fees, or alimony, whether temporary or permanent.
3) The wife hereby covenants and agrees that she will not, at any time hereafter, contract any debts, charges, or obligations whatsoever for which the husband or his property or estate shall be liable, and the wife hereby agrees to indemnify the husband and save him harmless against any and all debts, charges, obligations, and liabilities which may be contracted by the wife after the date of this agreement.
4) The husband and wife each hereby grants, remises, and releases to the other any and all rights of dower or courtesy or statutory *Page 12 
rights in lieu thereof which each has or may hereafter acquire in the real or personal property of the other, wherever situated, by reason of inheritance or descent or by virtue of any statute of distribution, any decedent's estate law, or other statute or custom or by reason of their marital relationship. Each party hereby expressly waives any right of election under the Decedent's Estate Law of the State of New York, or under the laws of any other state against the last will and testament of the other. Each party hereby renounces any right of administration upon the estate of the other.
5) The husband and wife, each for himself and herself and his or her heirs, administrators, personal representatives and assigns, covenants and agrees to execute and deliver, at any time or times, all agreements, conveyances, assurances, or other documents which the other party, or his or her heirs, administrators, personal representatives or assigns, may reasonably require for the purpose of carrying out and giving full force and effect to the terms, covenants, and conditions of this agreement, so that the parties may act in all matters exactly as if they were single and unmarried.
6) Nothing contained in this instrument shall be deemed to bar the institution of an action for divorce by either party. In the event that either the husband or the wife should procure a decree of divorce at any time, this agreement shall continue and remain in full force and effect, notwithstanding the dissolution of the said marriage, and the relevant terms and conditions of this agreement shall be embodied in the said decree of divorce.
7) No modification or waiver of any of the terms of this agreement shall be valid unless in writing and executed with the same formality as this agreement. No waiver of any breach or default hereunder shall be deemed a waiver of any subsequent breach or default of a similar or dissimilar nature.
8) This agreement and all the terms, covenants, and conditions hereof shall enure to the benefit of and shall be binding upon the heirs, executors, administrators, personal representatives, and assigns of the respective parties hereto.
9) All matters affecting the interpretation of this agreement and the rights of the husband and wife hereunder shall be governed by the laws of the State of New York.
IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals this 3rd day of July, 1942, in the County of New York, State of New York.
 MAX WOLFF Max Wolff MIRIAM SIEGEL WOLFF Miriam Siegel Wolff."
[Certificates of acknowledgment, duly executed, attached.]
There is no doubt that complainant read this document carefully before executing it, and that no physical force or threats of any sort were used against her. The evidence justifies *Page 13 
the conclusion that defendant's lawyer took complainant at her word when she assured him, after thinking it over for a day as he had suggested, that she wanted the divorce to go through and did not want to be paid any money by defendant or to retain any financial hold upon him. He made no inquiry into her financial circumstances. The fact was that she had no income or property of her own but was entirely dependent upon her husband for support. Defendant was in her presence at all times during both of their visits to his attorney, and she was without independent advice.
As will be noted, the agreement (paragraph 9) provided that "all matters affecting the interpretation of this agreement and the rights of the husband and wife hereunder shall be governed by the laws of the State of New York," in spite of the fact that the matrimonial domicile was in this state. However, the law of New York does not differ substantially from our own with respect to the interpretation of the instrument and the definition of the rights of the respective parties thereunder, nor was it contended otherwise on the argument.
The defense contends that at the time this agreement was executed by complainant, a power of attorney was also executed by her, in blank, authorizing an undesignated attorney in Nevada to enter an appearance there for her in the divorce suit which defendant was to institute. Complainant denies having executed this power of attorney, and testimony was offered by both sides on the question whether her signature thereto was forged. That issue need not be adjudged, for reasons hereinafter noted. Let it be assumed that complainant did in fact sign the power in blank on July 3d, along with the copies of the agreement, and forgot that she had done so. She signed several copies of the agreement and was furnished with one of these copies but not (as I conclude from the evidence) with a copy of the power. When she later retained Mr. Halpern as her solicitor she informed him of the agreement, but not of the power. There was no reason for her to refrain from informing him of the power had she remembered signing it. On the contrary her interest obviously lay in telling him that she had done so. *Page 14 
When the parties left the office of defendant's attorney on July 3d they went together to the Hotel Victoria in New York City, where they spent the night together and indulged in sexual intercourse. Of this fact there is no doubt, strange as such conduct seems, for it is admitted by defendant. Thereafter they continued to indulge in sexual relations and to cohabit in marital harmony at Red Bank until July 5th, 1942, in spite of their separation agreement. During this interval no mention was made of the agreement or of divorce. Defendant seemed to his wife to be wooing her again and she was led to believe that he had forgotten their quarrel and that their marriage might still work out successfully. That was her desire. On July 5th complainant went to Woodstock, New York, for a previously planned vacation, defendant promising to join her there within a few days. He sent her $80 to pay her share of the rent of the Woodstock cottage. On July 11th or 12th he telephoned her there and in answer to her inquiry as to when he would join her he said that he had thought the matter over and had decided that "we had better stay separated."
Thereafter complainant received from the office of defendant's New York lawyer what she described as a "written consent for a divorce" and a request that she sign and return it. This was perhaps another power of attorney in which the name of an attorney was included, to be used in lieu of the original blank power. Be that as it may, she destroyed the papers and at once called up the defendant and told him that she would not sign any such consent. He protested that he had already purchased his tickets for Reno, Nevada, and asked her to meet him again in his New York lawyer's office on July 14th. She did meet him there on that date, but first retained a solicitor, Mr. Halpern, who accompanied her.
At this conference complainant and Mr. Halpern expressly repudiated the agreement and made it very clear that complainant would not agree to defendant's procuring a divorce. Had they known of the existence of the power of attorney they would doubtless have repudiated it in express terms and demanded that it be delivered up for cancellation. But *Page 15 
their announcement that complainant would not agree to any such proceeding amounted to an effective repudiation and revocation of the power. Mr. Halpern demanded that provision be made for the support and maintenance of his client, notwithstanding the agreement. No accord was reached with respect thereto although various amounts were mentioned. Mr. Halpern and his client left the office with the understanding that Mr. Halpern would call back within a few days for an answer to his demand that complainant be allowed $150 per month.
During the conference complainant through her solicitor offered to return and live with her husband, but defendant replied "That is ridiculous; we never can live together anymore."
On July 22d Mr. Halpern called up defendant's New York lawyer and was informed that defendant declined to pay his wife anything. This suit resulted. The bill was filed on September 25th, 1942. At that time both Mr. Halpern and his client were in complete ignorance of the fact that defendant had actually gone to Nevada and had started a suit there on September 21st. By use of the repudiated power of attorney, in which there had been filled in the name of a Nevada lawyer, no process or notice to complainant was necessary under Nevada law. No process was issued nor was notice given. Complainant had heard nothing from her husband since the July 14th conference. The first knowledge that complainant or her solicitor had of the Nevada proceedings was through defendant's answer to this suit, filed after the Nevada decree had been entered.
Taking up the special defenses, the first question presented for determination is whether the separation agreement in itself constitutes a defense to this suit. In my judgment it does not, for a number of reasons. For one thing it was executed by complainant without independent advice and in her husband's presence, and was shockingly improvident in view of her complete financial dependence upon him. The most confidential of all relationships is that between husband and wife, and transactions between them, to be valid, particularly *Page 16 
as to her, must be fair and reasonable. Such transactions are jealously scrutinized in equity to prevent the wife from being overreached, defrauded or coerced by the undue influence or improper conduct of the husband. Contracts between husband and wife are void at law and are recognized as valid in equity only if they are just and fair. They will not be enforced in equity to accomplish what is unfair, unjust or oppressive. Fike v. Fike,3 N.J. Mis. R. 485; 128 Atl. Rep. 849; affirmed, 99 N.J. Eq. 424;132 Atl. Rep. 922; Ward v. McLellan, 117 N.J. Eq. 475;176 Atl. Rep. 571; Hall v. Otterson, 52 N.J. Eq. 522; 28 Atl. Rep. 907;affirmed, 53 N.J. Eq. 695; 35 Atl. Rep. 1130; Fried v. Fried,99 N.J. Eq. 106; 132 Atl. Rep. 674; Hunt v. Johnson, 44 N.Y. 27; 4 Am. Rep. 631; Graham v. Graham, 143 N.Y. 573;38 N.E. Rep. 722; Boyd v. De La Montagnie, 73 N.Y. 498;29 Am. Rep. 197; Tirrell v. Tirrell, 232 N.Y. 224; 133 N.E. Rep. 569;Hungerford v. Hungerford, 161 N.Y. 550; 56 N.E. Rep. 117;Peyton v. William C. Peyton Corp., 7 Atl. Rep. 2d 737;123 A.L.R. 1482; 26 Am. Jur. 876. In Lister v. Lister,86 N.J. Eq. 30; 97 Atl. Rep. 170, the husband set up in defense of the wife's suit for separate maintenance a release executed by her for what was held to be an inadequate consideration, in full settlement of all her claims against him. It was held that the agreement was not enforceable in equity and for that reason was no defense to the suit.
Where a transaction between persons who are in a relationship of trust and confidence toward each other results in a disproportionate benefit to one of them, who is in a position to exert undue influence or coercion upon the other, there is a presumption that such undue influence or coercion was in fact exercised, and that presumption cannot be overcome without proof that the other party to the transaction had the benefit of independent advice. Pironi v. Corrigan, 47 N.J. Eq. 135;20 Atl. Rep. 218; Slack v. Rees, 66 N.J. Eq. 447;59 Atl. Rep. 466; 69 L.R.A. 393; Post v. Hagan, 71 N.J. Eq. 234;65 Atl. Rep. 1026; 124 Am. St. Rep. 997; Reeves v. White, 84 N.J. Eq. 661; 95 Atl. Rep. 185; *Page 17 Bensel v. Anderson, 85 N.J. Eq. 391; 96 Atl. Rep. 910;
modified on other grounds, 87 N.J. Eq. 364; 101 Atl. Rep. 262.
The complainant in the present case had no independent advice when she executed the agreement purporting to release her husband from all claim for support and maintenance, past, present and future, without any consideration of value moving to her. She acted impulsively, her judgment overcome by emotion. It was her husband's duty to protect her from herself and to decline to permit her to execute such an utterly improvident agreement. In equity her release must be deemed to have been the result of the undue influence or coercion of her husband and does not constitute a defense to her suit.
There are other reasons why the contract cannot stand in equity. One is that there was no consideration. It is true that the defendant thereby released any rights he had or might come to have in her property, but since she had no property, and, so far as the record shows, no prospect of inheriting or otherwise acquiring any, she gained nothing of value thereby.
Moreover, the agreement was in essence intended to facilitate the procuring of a divorce by defendant. Together with the power of attorney it memorialized, and was designed to prevent the parties from repudiating, their collusive agreement to procure a divorce notwithstanding the fact that no cause of action for divorce existed under the law of this state, where defendant was and admittedly intended to remain domiciled. It therefore necessarily contemplated the procuring of a decree for divorce in another state upon a fraudulent simulation of domicile. The agreement is void as against public policy, because it was intended to facilitate the procuring of a divorce (Hemingway v.Ball, 118 N.J. Eq. 378, 380; 179 Atl. Rep. 374; affirmed,119 N.J. Eq. 471; 183 Atl. Rep. 172; Restatement: Contracts, §§ 584,586; In re Rhinelander's Estate, 290 N.Y. 31; 47 N.E. Rep.
2d 681), because its performance necessarily would (and did) violate the law of our sister State of Nevada, *Page 18 
whose statute requires domicile as distinguished from mere residence in that state as a jurisdictional basis for divorce, (As to the Nevada statute, Latterner v. Latterner, 51 Nev. 285; 274 Pac. Rep. 194; Lamb v. Lamb, 57 Nev. 421;65 Pac. Rep. 2d 872; Williams v. State of North Carolina, infra
[p. 195 of the L.Ed.]. As to the public policy, Graves v.Johnson, 156 Mass. 211; 32 Am. St. Rep. 446; 15 L.R.A. 834;Rosenbaum v. United States Credit System Co., 64 N.J. Law 34;44 Atl. Rep. 966; reversed on the facts, 65 N.J. Law 255;48 Atl. Rep. 237; 53 L.R.A. 449; see Alleghany Co. v. Allen,69 N.J. Law 270; 55 Atl. Rep. 724; 17 C.J.S. 652), and because it contemplated the suppression and falsification of evidence of domicile to be offered in the Nevada suit (17 C.J.S. 598;Restatement: Contracts, §§ 554, 555).
Then, too, the parties' continued normal cohabitation following the execution of the separation agreement, as though such agreement had never been made, effectually put an end to it (assuming that it was originally valid) and constituted a condonation of any cause of action for divorce if such cause had previously existed. See Whittle v. Schlemm, 93 N.J. Law 78,81; 106 Atl. Rep. 819; affirmed, 94 N.J. Law 112, 114;109 Atl. Rep. 305; Rushmore v. Rushmore, 114 N.J. Eq. 151;168 Atl. Rep. 614; 27 C.J.S. 621, 622; 27 Am. Jur. 19.
Furthermore, the agreement is invalid because it was beyond the competence of the parties to make it. Husband and wife cannot by contract extinguish the husband's obligation to support and maintain his wife. Parmly v. Parmly, 125 N.J. Eq. 545;5 Atl. Rep. 2d 789; Kyff v. Kyff, 286 N.Y. 71, 74; 35 N.E. Rep.
2d 655, 657; see Jackson v. Jackson, 290 N.Y. 512;49 N.E. Rep. 2d 988.
Since the separation agreement is invalid it does not in itself constitute a defense to this suit. Whether its adoption and inclusion by the Nevada court in the defendant's divorce decree vitalizes it and gives it protection under the full faith and credit clause, under the circumstances of this case, depends upon whether the decree for divorce in itself has *Page 19 
extra-territorial validity, for it is incidental to and must stand or fall with the main decree.
In my judgment the Nevada divorce decree, with its incidents, is not protected by the United States Constitution and is invalid in New Jersey. It was procured without notice to the defendant (the complainant here) and without opportunity to her to be heard, by means of the fraudulent use of the power of attorney which had been repudiated and revoked as above pointed out. It has no foundation of procedural due process, and is invalid everywhere (Restatement: Judgments, § 121), including the State of Nevada where it was rendered. Lang Syne Gold Mining Co. v.Ross, 20 Nev. 127; 18 Pac. Rep. 358; 19 Am. St. Rep. 337. In instituting and prosecuting his Nevada suit defendant was guilty of fraud extrinsic of and collateral to the subject-matter of the suit. Extrinsic or collateral fraud is defined in United States
v. Throckmorton, 98 U.S. 61; 25 L.Ed. 93; to be such fraud on the part of the successful party to a suit as produces a situation where "there was, in fact, no adversary trial or decision of the issue in the case. Where the unsuccessful party has been prevented from exhibiting fully his case by fraud or deception practiced on him by his opponent, as by keeping him away from court, or a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff; or where an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side — these, and similar cases which show that there has never been a real contest in the trial or hearing of the case, are reasons for which a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and fair hearing." See Wilson v. Anthony, 72 N.J. Eq. 836;66 Atl. Rep. 907; affirmed, 75 N.J. Eq. 299; 15 Words and Phrases
(Perm. Ed.) 901; Reporter's Annotations, 88 A.L.R. 1201;31 Am. Jur. tit. "Judgments," 230 § 654.
In their briefs counsel discussed the effect on the instant *Page 20 
case of the decisions of the United States Supreme Court inDavis v. Davis, 305 U.S. 32; 83 L.Ed. 26; 59 S.Ct. 3;118 A.L.R. 1518, and Williams v. State of North Carolina,317 U.S. 287; 87 L.Ed. 189; 63 S.Ct. 207; 143 A.L.R. 1273. Of course neither of these cases is in point where, as here, such extrinsic fraud is shown as to amount to a denial of due process.
Nor do I think that either of those decisions aids the defendant, even if the element of extrinsic fraud be disregarded. In the Davis Case it was held that if the defendant appeared and actually contested the plaintiff's claim of domicile in the state of the forum the decree of the court based upon an adjudication that such domicile existed is entitled to full faith and credit in the other states of the Union. But that rule has never been extended to cases in which, though defendant's appearance was entered, the question of domicile was not actually litigated. See Reporter's note, 118 A.L.R. 1524. The effect of the Davis Case is merely to import into our national jurisprudence the local state doctrines of res judicata. Riley
v. New York Trust Co., 315 U.S. 343; 86 L.Ed. 885;62 S.Ct. 608; rehearing denied, 315 U.S. 829; 86 L.Ed. 1223;62 S.Ct. 903. Under settled res judicata principles it is the rule that in a subsequent action between the same parties upon a different claim or demand the final judgment in the former case is conclusive only as to the issues actually litigated. Phillips
v. Phillips, 119 N.J. Eq. 497; 183 Atl. Rep. 222. As a practical matter it may be observed that in strictly matrimonial litigation the subsequent suit is seldom predicated upon the same cause of action which was the basis of the decree in the prior suit.
In the Williams Case the court discarded the rule which it had previously established in the case of Haddock v. Haddock,201 U.S. 562; 50 L.Ed. 867; 26 S.Ct. 525; 5 Ann. Cas. 1, and substituted in lieu thereof the same standard which our own New Jersey courts apply in testing the validity in this state of decrees for divorce rendered in the courts of other states. In the Williams Case there was no proof of fraud in the simulation of domicile in Nevada, and it was conceded *Page 21 
by the respondent that there was probably enough evidence in the record to require that the petitioners in the Nevada divorce proceedings be considered to have been actually domiciled in Nevada. While the circumstances cast doubt upon the evidence, there was no actual proof per contra. Fraud cannot be established except by strict proof. Suspicion or surmize, however seemingly justified, do not amount to proof. The majority opinion (pp. 197, 199 of the L.Ed.) carefully points out: "But the question for us is a limited one. In the first place, we repeat that in this case we must assume that petitioners had a bonafide domicile in Nevada, not that the Nevada domicile was a sham. We thus have no question on the present record whether a divorce decree granted by the courts of one state to a resident as distinguished from a domiciliary is entitled to full faith and credit in another state. Nor do we reach here the question as to the power of North Carolina to refuse full faith and credit to Nevada divorce decrees because, contrary to the findings of the Nevada court, North Carolina finds that no bona fide domicile was acquired in Nevada." * * * "North Carolina did not base its disregard of the Nevada decrees on the claim that they were a fraud and a sham, and no claim was made here on behalf of North Carolina that the decrees were not valid in Nevada." The court expressly distinguished Bell v. Bell, 181 U.S. 175;45 L.Ed. 804; 21 S.Ct. 551, in which it was held that a decree for divorce was not entitled to full faith and credit when it had been granted on constructive service of process by a court of a state in which neither party was domiciled. To the same effect asBell v. Bell is the decision in Streitwolf v. Streitwolf,58 N.J. Eq. 563; 41 Atl. Rep. 876; 43 Atl. Rep. 683;45 L.R.A. 842; affirmed, 181 U.S. 179; 45 L.Ed. 807; 21 S.Ct. 553. See Reporter's annotations and notes, 143 A.L.R. 1294. By its decision in the Williams Case the Supreme Court has adopted the same standard for testing the effect of the full faith and credit clause of the United States Constitution as the courts of this state have consistently applied for testing the effect of our own full faith and credit clause (R.S. *Page 22 2:50-35), to wit, that a decree for divorce made by a court of competent jurisdiction, based upon procedural due process and predicated upon evidence that the petitioner therein was domiciled in the state of the forum, against a defendant domiciled elsewhere (the bona fides of petitioner's domicile in that state not actually having been litigated in that state) is entitled to full faith and credit when challenged in a subsequent suit between the same parties for a different cause of action in another state, unless it can be shown by strict proof that such petitioner was not in fact domiciled in the state where the decree was rendered, but that he falsely and fraudulently simulated such domicile. Sprague v. Sprague, 131 N.J. Eq. 104;23 Atl. Rep. 2d 810.
The corollary, well settled by the federal decisions and unaffected by the ruling in the Williams Case, is that a decree for divorce, although rendered by a court of competent jurisdiction and based upon procedural due process and upon evidence that the petitioner therein was domiciled in the state of the forum, against a defendant domiciled elsewhere (the bonafides of petitioner's domicile in that state not actually having been litigated in that suit) is not entitled to full faith and credit when challenged in a subsequent suit between the same parties for a different cause of action in another state, if it is proved that such petitioner was not in fact domiciled in the state where the decree was rendered, but that he falsely and fraudulently simulated such domicile.
In the instant case it is proved that defendant never was domiciled in Nevada. We have it from his own lips that his plan was to remain in Nevada just long enough to procure his decree and then, after a visit of a few days to some of his customers in California, to return to New Jersey, the place of his domicile. That is precisely what he did. His Nevada decree was based upon his fraudulent simulation of domicile in that state, and is not entitled to the protection of the full faith and credit clause of the United States Constitution or to recognition under our own public policy. It is therefore invalid as a defense to complainant's present suit for separate maintenance. Sprague v.Sprague, supra; see *Page 23 Williams v. State of North Carolina, supra (p. 195 of theL.Ed.).
Defendant urges that complainant is estopped by her conduct to bring this suit, and that she has not brought it and is not prosecuting it in good faith. There is no justification for such a contention. If fraud could have been imputed to her because of her original participation in the illegal scheme, it certainly can no longer be imputed to her after her timely repudiation of that scheme. The fraud was his, not hers, and he is estopped to urge the defense of estoppel against her. Hollingshead v.Hollingshead, 91 N.J. Eq. 261; 110 Atl. Rep. 19.
What has been said disposes of the special defenses. As to the general denial the evidence discloses that defendant repulsed complainant's offer of reconciliation made at the July 14th conference. No subsequent communication took place between the parties, nor has defendant paid complainant any money for her support and maintenance since that date. Her demand for support was definitely refused on July 22. Defendant's Nevada divorce proceeding followed. He is therefore guilty of having, without justifiable cause, abandoned his wife or separated himself from her, and of having refused or neglected to maintain and provide for her. Richman v. Richman, 129 N.J. Eq. 114; 18 Atl. Rep.
2d 403.
For the above reasons it is my judgment that complainant is entitled to a decree for her separate maintenance as prayed for in her bill.
A decree will be entered in conformity with the foregoing conclusions which are hereby adopted as the opinion of the court to be published in the official reports.
 LUTHER A. CAMPBELL, Chancellor. *Page 24